**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

ENVIRONMENTAL INTEGRITY PROJECT,      )
CENTER FOR EFFECTIVE GOVERNMENT,      )
CHESAPEAKE CLIMATE ACTION NETWORK,    )
CITIZENS FOR PENNSYLVANIA'S FUTURE,   )
CLEAN AIR COUNCIL,                    )
DELAWARE RIVERKEEPER NETWORK,         )
NATURAL RESOURCES DEFENSE COUNCIL,    )
RESPONSIBLE DRILLING ALLIANCE, and    )
TEXAS CAMPAIGN FOR THE ENVIRONMENT,   )
                                      )
          Plaintiffs,                 )
                                      ) Civil Action No. 1:15-cv-17
    v.                                )
                                      ) **COMPLAINT FOR DECLARATORY**
UNITED STATES ENVIRONMENTAL           ) **AND INJUNCTIVE RELIEF**
PROTECTION AGENCY and                 )
GINA McCARTHY, in her official capacity as )
Administrator, United States Environmental )
Protection Agency,                    )
                                      )
          Defendants                  )
_____ )

## INTRODUCTION

1.      The oil and gas extraction industry ("industry") is one of the largest sources of

toxic releases in the United States.

2.      In air emissions alone, the industry releases an estimated 127,000 tons of

hazardous air pollutants annually—more than any other industry sector except electric utilities.

3.      Due to inaction by the U.S. Environmental Protection Agency (EPA), the industry

remains exempt from one of the nation's most basic toxic pollution reporting mechanisms: the

Toxics Release Inventory (TRI).

4.      Pursuant to the Emergency Planning and Community Right-to-Know Act

(EPCRA), EPA has authority to subject facilities within an industry sector to the TRI's reporting

requirements if "such action is warranted on the basis of toxicity of the toxic chemical, proximity to other facilities that release toxic chemicals or to population centers, the history of releases of such chemical at such facility, or other such factors as . . . appropriate." 42 U.S.C. § 11023(b)(2).

5.       With the recent expansion of hydraulic fracturing ("fracking") and horizontal drilling as mainstream technologies in the industry, the number of facilities within the oil and gas extraction industry has increased dramatically in the last decade.

6.       The types of facilities within this industry include field-level facilities such as oil and gas wells, storage tanks, and impoundments, as well as larger downstream facilities, such as compressor stations, natural gas processing plants, and natural gas liquids fractionators.

7.       Simultaneously, the volume and variety of toxic chemicals used by the industry has expanded significantly.

8.       Many of these chemicals are carcinogenic, neurotoxic, or otherwise harmful to human health.

9.       The industry releases toxic chemicals into the environment through a number of ways, including emissions to the air, discharges to surface waters, contamination of groundwater, underground injection, and disposal in landfills.

10.       Because federal and state disclosure requirements are full of gaps and exemptions and otherwise have not kept pace with industry expansion, public information about the oil and gas extraction industry's use and release of these toxic chemicals remains scant, particularly as compared to other industry sectors.

11.     In 1996 and 1997, EPA conducted a rulemaking under its EPCRA authority to consider certain industry sectors, including the oil and gas extraction industry, for addition to the list of facilities required to report to the TRI.

12.     As part of this rulemaking, EPA stated that "oil and gas extraction classified in SIC code 13[] is believed to conduct significant management activities that involve EPCRA section 313 chemicals."

13.     Regardless, EPA decided not to add the oil and gas extraction sector  at the time, claiming technical questions of how to define a standard facility unit.  EPA stated that it would address these issues in the future.

14.     On October 24, 2012, more than sixteen years after EPA first considered adding the oil and gas extraction industry, Plaintiffs submitted a petition to EPA ("Petition") requesting that the agency initiate rulemaking to add the industry to the list of facilities required to report releases of toxic chemicals to the TRI pursuant to EPCRA, 42 U.S.C. § 11023(b), and the Administrative Procedure Act (APA), 7 U.S.C. § 553(e).

15.     More than two years have passed without a final response to the Petition by EPA.

16.     EPA's delay in responding to the Petition is unreasonable and therefore in violation of the requirements of the APA.  5 U.S.C. § 555(b).

17.     Plaintiffs seek a judgment from this Court declaring that EPA's unreasonable delay in responding to the Petition violates the APA.  Plaintiffs also seek an order from this Court compelling EPA to issue a final response to the Petition within sixty days.  5 U.S.C. §§ 702, 706(1).

## JURISDICTION AND VENUE

18.     Plaintiffs bring this action under the APA, 5 U.S.C. § 706(1).

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, which provides federal district courts with original jurisdiction over all civil actions arising under the laws of the United States.

20.     This Court may award Plaintiffs all necessary declaratory and injunctive relief pursuant to the APA, 5 U.S.C. § 706(1), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

21.     Venue is proper in this Court pursuant 28 U.S.C. § 1391(e)(3) because Defendants EPA and McCarthy have their headquarters and principal office in the District of Columbia, a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Columbia, and Plaintiffs EIP and Center for Effective Government maintain their headquarters and principal offices in the District of Columbia.

## PARTIES

22.     Plaintiff EIP is a national nonprofit organization existing and organized under the laws of the District of Columbia.  EIP is dedicated to advocating for more effective enforcement of environmental laws.  EIP has three goals: (1) to provide objective analyses of how the failure to enforce or implement environmental laws increases pollution and affects public health; (2) to hold federal and state agencies, as well as individual corporations, accountable for failing to enforce or comply with environmental laws; and (3) to help local communities obtain the protection of environmental laws.

23.     The Center for Effective Government (CEG), known as OMB Watch at the time of the Petition's filing, is a nonprofit research and advocacy organization dedicated to building

an open, accountable government that invests in the common good, protects people and the environment, and advances national priorities defined by an active, informed citizenry.  CEG has long worked on issues surrounding the TRI and more broadly the public right to know.  In its first decade, CEG organized a coalition focused on the implementation of EPCRA's requirement that EPA make TRI data available through "computer telecommunications and other means." Over the years, CEG has been a constant advocate to maintain and even expand the TRI program, most notably organizing strong public opposition to rulemakings that sought to significantly rollback reporting requirements.  CEG has closely studied the varying successes and shortcomings of state fracking disclosure rules, which Plaintiffs extensively cited in the Petition as one of the needs for TRI reporting by the industry.

24.     The Chesapeake Climate Action Network (CCAN) is a regional, grassroots, nonprofit organization representing over 90,000 members in Washington, D.C., Maryland and Virginia.  CCAN was founded to transition the mid-Atlantic region towards clean energy solutions to climate change.  CCAN's mission is to educate and mobilize citizens in a way that fosters a rapid societal switch to clean energy sources and away from fossil fuel-based energy production and extraction activities that contribute to global warming.  This mission includes ensuring that dangerous energy extraction activities, such as fracking, do not impact the health and safety of their members who reside in the Marcellus Shale regions of Maryland and Virginia. As one method of achieving this mission, CCAN participates in environmental permit proceedings of oil and gas drilling activities at the state level, to ensure compliance with federal and state environmental pollution laws.

25.     The Clean Air Council is a member-supported environmental organization serving the Mid-Atlantic Region.  The Council is dedicated to protecting and defending

everyone's right to breathe clean air.  The Council works through a broad array of related sustainability and public health initiatives, using public education, community action, government oversight, and enforcement of environmental laws.

26.     The Delaware Riverkeeper Network (DRN) is the only environmental organization working throughout the four-state watershed of the Delaware River: New York, New Jersey, Pennsylvania, and Delaware.  DRN has been involved in natural gas drilling and fracking issues since 2008, when landowners in the Upper Delaware River Watershed, located above the Marcellus Shale formation, first started leasing their mineral rights.  Although natural gas drilling has not yet begun in the Basin, other activities within the oil and gas extraction industry are already impacting environmental quality in the watershed, such as water withdrawals for hydraulic fracturing, pipelines, compressor stations, gas processing and storage facilities, wastewater processing and discharge, and waste disposal or storage facilities.  DRN works on natural gas development at the federal, regional, state, and local levels, including community education and organization, extensive advocacy to legislators and agency decision-makers, and litigation in federal and state courts.

27.     The Natural Resources Defense Council (NRDC) is a nonprofit environmental action group established in 1970 by a group of law students and attorneys at the forefront of the environmental movement.  NRDC's purpose is to safeguard the Earth: its people, its plants and animals and the natural systems on which all life depends.  NRDC uses law, science and the support of 1.2 million members and online activists to protect the planet's wildlife and wild places and to ensure a safe and healthy environment for all living things.  NRDC has worked for many years to ensure the proper regulation of oil and gas exploration and production operations.

28.     Citizens for Pennsylvania's Future ("PennFuture") is a public interest membership organization whose purposes include advocating and litigating on behalf of clean air, pure water, public health, and public lands in Pennsylvania.  PennFuture has worked since 1998 to create a just future where nature, communities, and the economy thrive in Pennsylvania, and today has offices in Harrisburg, Philadelphia, Pittsburgh, and Wilkes-Barre.  PennFuture's membership today includes many citizens of the Commonwealth who live, work, and recreate in areas where oil and gas development activities are occurring.

29.     The Responsible Drilling Alliance (RDA) is a nonprofit membership organization based in Williamsport, Pennsylvania, that seeks to educate its members and the public about the consequences of unconventional gas development, and advocates for the protection of natural resources and human health, safety, and quality of life in central Pennsylvania.  RDA was formed by citizens in 2009 in response to the industrial transformation of the region, following the arrival of the unconventional gas extraction industry, and today its members include parents and grandparents, students, businesspeople, hunters, fishermen, farmers, hikers, teachers, truckers, those who have leased their land to a gas company, and those who refused.

30.     Texas Campaign for the Environment (TCE) is a nonpartisan, nonprofit citizens' organization dedicated to informing and mobilizing Texans to protect the quality of their lives, their health, their communities and the environment.  TCE works to hold government and businesses accountable to public concern on Texas health, environmental, and economic issues. TCE promotes policies that ensure clean air and clean water, while encouraging recycling and the reduction of waste.  TCE protects citizens' right to know about pollution in their communities.

31.     Plaintiffs bring this action on behalf of themselves and their members.

32.     Plaintiffs' members include individuals who reasonably fear the environmental and health risks from toxic chemicals released by facilities in the oil and gas extraction industry. Plaintiffs' members have encountered such toxic chemicals in the past and/or fear that they will encounter these chemicals in the future through emissions to the air, spills to surface water, contamination of groundwater and drinking water supplies, and other means of exposure. Without TRI reporting by the oil and gas extraction industry, Plaintiff's members lack needed information on these toxic chemicals and their releases and cannot adequately protect themselves from exposure or make informed decisions to plan for their health, families, futures, and communities.

33.     EPA's failure to issue a final response to Plaintiffs' Petition prolongs these harms and prevents Plaintiffs' members from taking informed measures to remedy or mitigate the harms.

34.     EPA's failure to issue a final response also deprives Plaintiffs and their members of a decision on the merits of the Petition and the opportunity to seek judicial review of the decision if necessary.

35.     This failure has also made it more difficult for Plaintiffs to achieve their organizational objectives of protecting their members and the environment from the risks of toxic chemicals and informing their members, the public, and decision makers about these risks.

36.     For example, Plaintiffs' ability to monitor compliance and enforcement under federal environmental laws is adversely affected because the industry is not required to report toxic chemical releases to the TRI.

37.     These injuries would be redressed by a declaratory judgment that EPA's failure to respond to Plaintiffs' Petition is unreasonable and in violation of the APA and by an order compelling EPA to respond to the Petition by a date certain.

38.     Defendant EPA is the federal agency charged with implementing the TRI and promulgating rules under EPCRA, including rules for the addition of industry sectors, and with responding to citizen rulemaking petitions in accordance with the requirements of the APA.

39.     Defendant Gina McCarthy, Administrator of EPA, is the federal official responsible for EPA's administration of its legal authorities and duties, including under EPCRA and the APA.

40.     Plaintiffs sue Administrator McCarthy in her official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

41.     As enacted, EPCRA applies TRI reporting requirements to facilities "that are in Standard Industrial Classification Codes 20 through 39 (as in effect on July 1, 1985)," provided those facilities meet certain threshold requirements.  42 U.S.C. § 11023(b)(1)(A).

42.     "Standard Industrial Classification Codes" refer to those published in the Standard Industrial Classification Manual by the Office of Management and Budget, as in effect January 1, 1987.  *See* 40 C.F.R. §§ 372.3, 372.22(b).

43.     The corresponding North American Industry Classification System codes are those "in effect on January 1, 2007, for reporting year 2008 and thereafter."  40 C.F.R. § 372.22(b).

44.     EPCRA also provides EPA with the authority to subject industry sectors beyond those in Standard Industrial Classification Codes 20 through 39 to TRI reporting requirements if "such action is warranted on the basis of toxicity of the toxic chemical, proximity to other

facilities that release toxic chemicals or to population centers, the history of releases of such chemical at such facility, or other such factors as the Administrator deems appropriate."  42 U.S.C. § 11023(b)(2).

45.     EPA has articulated three primary factors that it considers when determining whether to add a candidate industry sector to the TRI: (a) "Whether one or more toxic chemicals are reasonably anticipated to be present at facilities within the candidate industry group ('chemical' factor);" (b) "whether facilities within the candidate industry group 'manufacture,' 'process,' or 'otherwise use' these toxic chemicals ('activity' factor);" and (c) "whether facilities within the candidate industry group can reasonably be anticipated to increase the information made available pursuant to EPCRA section 313, or otherwise further the purposes of EPCRA section 313 ('information' factor)."  62 Fed. Reg. 23,834, 23,836 (May 1, 1997).

46.     As required by the APA, each federal agency "shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule."  7 U.S.C. § 553(e).

47.     The APA requires that "within a reasonable time, each agency shall proceed to conclude a matter presented to it."  7 U.S.C. § 555(b).

48.     The APA provides for judicial review to "compel agency action unlawfully withheld or unreasonably delayed."  7 U.S.C. §§ 702, 706(1).

## FACTUAL BACKGROUND

The Toxics Release Inventory and EPA's Authority to Add Industry Sectors

49.     Congress enacted the TRI in 1986 as section 313 of EPCRA.

50.     The enactment of the TRI—and EPCRA as a whole—was in part a response to the 1984 disaster in Bhopal, India, in which a chemical manufacturing plant emitted a cloud of toxic gases that killed thousands of local residents.

51.     EPA has articulated the purposes of the TRI program as: "(1) [p]roviding a complete profile of toxic chemical releases and other waste management activities; (2) compiling a broad-based national database for determining the success of environmental regulations; and (3) ensuring that the public has easy access to these data on releases of toxic chemicals to the environment."  62 Fed. Reg. at 23,836.

52.     In furtherance of these purposes, the TRI requires facilities in certain industrial sectors to file annual reports of the amounts of toxic chemicals the facilities release to the environment or otherwise dispose of.  *See* 42 U.S.C. § 11023(a), (g).

53.     For purposes of the TRI, the term "toxic chemical" refers to "a chemical or chemical category listed in [40 C.F.R.] § 372.65."  40 C.F.R. § 372.3.

54.     The chemicals and chemical categories listed in 40 C.F.R. § 372.65 include the original chemicals designated by Congress, with subsequent additions and deletions by EPA. *See* 42 U.S.C. § 11023(c)-(d).

55.     According to EPA, the "current TRI toxic chemical list contains 594 individually-listed chemicals and 30 chemical categories (including three categories containing 62 specifically-listed chemicals)," for a total of 683 chemicals and chemical categories.

56.     The TRI annual reporting requirements apply to owners and operators of facilities that: (a) have ten or more full-time employees, (b) are in a TRI-listed industrial sector, and (c) have manufactured, processed, or otherwise used one of the nearly 700 TRI-listed toxic chemicals (or categories of chemicals) in excess of the listed threshold quantity during the calendar year.

57.   As originally enacted by Congress, the TRI only applied to the manufacturing industrial sectors: those identified by Standard Industrial Classification Codes 20 through 39. *See* 42 U.S.C. § 11023(b)(1)(A).

58.   However, Congress also vested in EPA "clear authority" to add new industry sectors.  62 Fed. Reg. at 23,836; 42 U.S.C. § 11023(b)(2).

59.   As EPA has acknowledged, "[t]he initial list of chemicals and facilities identified in the original legislation was meant as a starting point.  Congress recognized that the TRI program would need to evolve to meet the information needs of a better informed public and to fill information gaps that would become more apparent over time."  62 Fed. Reg. at 23,834.

60.   In 1995, President Clinton stated his "commit[ment] to the effective implementation of this law, because Community Right-to-Know protections provide a basic informational tool to encourage informed community-based environmental decision making and provide a strong incentive for businesses to find their own ways of preventing pollution."  60 Fed. Reg. 41,791.  Specifically, the President ordered EPA to continue rulemaking to add to the list of TRI industry sectors "on an expedited basis" and to complete this rulemaking "on an accelerated schedule."  *Id.*

61.   In 1996 and 1997, EPA exercised this authority and issued a final rule adding seven additional industry sectors—or segments of sectors—to the TRI list of facilities.  62 Fed. Reg. at 23,834.

62.   These sectors included resource-extraction industry sectors such as metal mining and coal mining and energy-related industry sectors such as electric utilities.  *Id.*

12

63.     Although EPA had considered the oil and gas extraction industry as a "primary candidate" for addition, due to its significant use of TRI-listed toxic chemicals, it ultimately chose not to add the sector.  61 Fed. Reg. 33,588, 33,592 (June 27, 1996).

64.     While EPA stated that "oil and gas extraction classified in SIC code 13[] is believed to conduct significant management activities that involve EPCRA section 313 chemicals," it opted to "defer[] action to add this industry group at this time because of questions regarding how particular facilities should be identified." *Id.* (citing EPA, *Additional Considerations in Selecting Industries for Addition to EPCRA Section 313* (1996)).

65.     Specifically, EPA believed that if one were to consider the smallest possible units as facilities—the individual oil or gas well—these units would not meet the employee and chemical thresholds required for reporting.  *Id.*

66.     EPA stated that it would "be addressing these issues in the future."  *Id.*

67.     In its 2000 *Profile of the Oil and Gas Extraction Industry*, EPA noted the possibility of a new proposed rule to add the industry to the TRI: "The possible addition of the industry was considered carefully in 1996, but was not added at that time.  The proposal may enter the proposed rule stage in December, 2000, but no definite schedule had been set at the time of the publication of this document."

68.     In late 2011, EPA commenced an online "discussion forum" in order to "define the scope of a potential forthcoming rule" for the addition of six industry sectors to the TRI: "Iron Ore Mining, Phosphate Mining, Solid Waste Combustors and Incinerators, Large Dry Cleaning, Petroleum Bulk Storage, and Steam Generation from Coal and/or Oil."

69.     While the oil and gas extraction industry was not included in the list of industry sectors put forward in the discussion forum, all but one of the six industry sectors were either

sectors that EPA previously had deferred adding—like the oil and gas extraction industry—or expansions of sectors added in the 1996-97 rulemaking.

70.    Plaintiff CEG provided comments to EPA's discussion forum on the scope of the potential addition rule.  While CEG supported the addition of the six new sectors as a valuable strengthening of the TRI, it noted that significant contributors of toxic chemicals such as the oil and gas extraction industry were not yet TRI-reporting sectors and that "EPA should take immediate steps to review and add such polluting industry sectors to [the] TRI."

71.    As of the date that Plaintiffs submitted the Petition, EPA estimated on the discussion forum website that a proposed rule for the addition of the six new sectors "may be published by early 2013."

72.    At present, the discussion forum website is no longer available online, and EPA's Regulatory Development and Retrospective Review Tracker estimates that the next milestone for the potential addition of the six industry sectors will be "[Notice of Proposed Rulemaking]: Published in [Federal Register]," taking place on "09/2015 (projected)."

73.    Since its addition of the seven industry sectors in 1997, EPA has not added any additional industry sectors to the TRI.

The Modern Oil and Gas Extraction Industry

74.    The oil and gas extraction industry is a vast sector that extends from oil and gas exploration up until the natural gas is ready for transport to market or the oil is ready for transport to a refinery.

75.    The industry is identified by Standard Industrial Classification Code 13.

76.    The industry is also identified by at least seven North American Industry Classification System codes: 211111 (Crude Petroleum and Natural Gas Extraction), 211112

14

(Natural Gas Liquid Extraction), 213111 (Drilling Oil and Gas Wells), 213112 (Support

Activities for Oil and Gas Operations), 213112 (Support Activities for Oil and Gas Operations),

238910 (Site Preparation Contractors), and 541360 (Geophysical Surveying and Mapping

Services).

77.     The oil and gas extraction industry includes well pads, where drilling, fracking,

and waste storage take place; associated components that are used throughout the industry, such

as gathering pipelines, natural gas compressor stations, and storage tanks; natural gas processing

facilities, which include processes such as dehydration and sweetening; and certain downstream

components, such as natural gas liquids fractionation facilities.

78.     Over the past decade, the oil and gas extraction industry has grown vastly and

expanded into new areas of the U.S. due to two main advents: the mainstream use of horizontal

drilling and fracking technologies and the application of these technologies to unconventional oil

and gas formations.  Prior to the widespread availability of these technologies, development of

unconventional formations was much less feasible, both economically and technically.

79.     The oil and gas extraction industry's widespread use of these technologies has

increased the variety and volume of toxic chemicals used and released by industry, both as a

function of the volume of chemicals used and released by the technologies and as a consequence

of the expansion of downstream industry facilities driven by the technologies' resulting booming

oil and natural gas production.

80.     Each of the industry's processes uses and releases vast amounts of toxic

chemicals: well development uses and releases millions of gallons of muds, fluids, and additives

to drill and stimulate production; natural gas processing uses TRI-listed toxic chemicals to

remove toxic impurities from the fuel stream and releases these chemicals and byproducts to the

air; and regular venting, flaring, and leaking of toxic air emissions are endemic to the industry's processes and facilities.

81.     For example, a 2011 report by the Minority Staff of the United States House of Representatives Committee on Energy and Commerce, based on voluntary disclosures by fourteen leading oil and gas service companies, found that the industry regularly uses fracking products containing at least forty-five TRI-listed chemicals.  Methanol, 2-butoxyethanol, and ethylene glycol were the most commonly used of these TRI-listed chemicals, ranked by number of products containing the chemical.

82.     Some of the most toxic chemicals that the oil and gas extraction industry uses and releases include benzene, which is a carcinogen by all routes of exposure and which EPA has stated is one of the two key pollutants that contribute most to overall cancer risks; toluene, which causes cause serious neurological and developmental effects; and hydrogen sulfide, which in high concentrations is one of the most common causes of sudden death at the workplace, including at oil and gas well sites.

83.     In a 2012 recent rulemaking under the Clean Air Act, EPA estimated that the oil and gas industry emits at least 127,000 tons of hazardous air pollutants every year, including benzene, toluene, ethylbenzene, xylenes, and formaldehyde.

84.     Based upon EPA's estimate, the oil and gas extraction industry emits more hazardous air pollutants than any other industry sector required to report to the TRI except electric utilities.

85.     In January 2014, EIP collected air emissions data from six states and found that large oil and gas facilities emit a combined 8.5 million tons of TRI-listed toxic chemicals each

year in those states.  These facilities include natural gas processing plants, fractionation facilities, and compressor stations.

86.     EIP found that, within these six states, 395 facilities in the oil and gas extraction industry each emitted over 10,000 pounds of at least one toxic chemical, the annual threshold that would require reporting to the TRI for other industries.

87.     Given that the chemical threshold is meant to be measured from the amount of a chemical manufactured, processed, or used by a facility—not the amount actually released— there are likely many more facilities in these six states and the industry as a whole that would trigger reporting requirements.

88.     The oil and gas extraction industry releases TRI-listed toxic chemicals to surface water in several ways: through accidents such as well "blowouts" and impoundment failures, and via shipment to wastewater treatment plants, which sometimes are not able to handle the chemicals present in oil and gas wastewater or which can result in the generation of toxic trihalomethanes due to interaction between the treatment plants' disinfectants and the wastewater's bromides.

89.     The oil and gas extraction industry releases and disposes of TRI-listed toxic chemicals underground via the vast percentage of fracking fluids that do not return to the surface, leaching and migration from faulty impoundments and wells, and transport to disposal injection wells.

90.     The oil and gas extraction industry also disposes of large amounts of toxic chemicals through the shipment of drill cuttings, drilling muds, and sand to solid waste landfills. These landfills are often ill-equipped to handle the toxic chemicals present in these materials, which can include lead, arsenic, barium, chromium, and benzene.

91.     The oil and gas extraction industry overall has a vast toxic chemical footprint that reaches various environmental media of release and disposal.

The 2012 Petition

92.     On October 24, 2012, EIP and a total of sixteen co-petitioner organizations sent a "Petition to Add the Oil and Gas Extraction Industry, Standard Industrial Classification Code 13, to the List of Facilities Required to Report under the Toxics Release Inventory" to EPA Administrator Lisa Jackson.

93.     These co-petitioner organizations included Plaintiffs, with the exception of PennFuture and RDA.

94.     The Petition requested that EPA initiate rulemaking to add the oil and gas extraction industry to the list of facilities required to report releases of TRI-listed toxic chemicals. *See* Ex. A.

95.     The Petition described in particular how, driven by fracking, horizontal drilling, and the development of unconventional oil and gas formations, the oil and gas extraction industry has grown, increased its releases of toxic chemicals, and otherwise changed since EPA last considered adding the industry in 1996.

96.     The Petition addressed each of the three factors EPA uses when considering whether to add an industry—(a) whether TRI-listed chemicals are reasonably anticipated to be present at facilities in the candidate industry group, (b) whether facilities manufacture, process, or otherwise use these chemicals, and (c) whether facilities can reasonably be anticipated to increase the information made available pursuant to the TRI or otherwise further its purposes— and demonstrated there is little question that today's oil and gas extraction industry meets each of these factors.

97.     On December 10, 2012, EPA sent EIP a letter formally acknowledging receipt of the Petition and stating that it would consider the Petition "in accordance with applicable law, including the Emergency Planning and Community Right-to-Know Act (EPCRA) and the Administrative Procedure Act (APA)."  *See* Ex. B.

98.     On July 24, 2013, EPA opened a public docket for the Petition, EPA-HQ-TRI-2013-0281.  In its memorandum opening the public docket, EPA noted that the docket was "being made available for informational purposes only and will not be open for public comment."

99.     On July 29, 2013, representatives from Plaintiffs EIP, Center for Effective Government, Chesapeake Climate Action Network, NRDC, and Sierra Club met with representatives of EPA at EPA headquarters to present new and additional information related to the Petition and to offer further details regarding Plaintiffs' reasoning behind the Petition.

100.    As the meeting was scheduled by EPA as a "listening session," EPA representatives did not offer information regarding EPA's consideration of the Petition, including whether or when EPA would provide a final response.

101.    From January 2014 through the present, Plaintiffs have submitted additional information and documents to EPA in support of the Petition.

102.    For example, on January 30, 2014, Plaintiffs submitted emissions data and a cover letter drawn from state and national emissions inventories in six states, showing that several hundred facilities in the oil and gas extraction industry in those states clearly release TRI-listed toxic chemicals in exceedance of the chemical thresholds.  Plaintiffs submitted this information to the public docket for the Petition in order to demonstrate that the oil and gas extraction industry is an excellent candidate for addition to the requirements of the TRI.

103.     Plaintiffs also sought to demonstrate through this submission that, contrary to EPA's original concerns from the 1996 rulemaking regarding how to define facilities and whether such facilities would surpass the chemical threshold, hundreds if not thousands of large facilities currently exceed these thresholds and are clearly well-defined facilities.

104.     From July 2014 to the present, dozens of individuals living near facilities in the oil and gas extraction industry have submitted comments by email to EPA in support of the Petition.  At present, EPA has posted more than thirty of these emails to the public docket.

105.     On January 2, 2014, Plaintiff PennFuture sent a letter to EPA's docket for the Petition, stating that PennFuture formally joined as a co-petitioner to the Petition, with Plaintiff EIP's support.  *See* Ex. C.

106.     On January 5, 2014, Plaintiff RDA sent a letter to EPA's docket for the Petition, stating that RDA formally joined as a co-petitioner to the Petition, with Plaintiff EIP's support. *See* Ex. D.

107.     To date, EPA has not issued a final response to the Petition.

108.     EPA also has not publicly announced a date by which it anticipates issuing a final response, interim steps it will take, or any plans toward a final response.

## CLAIM FOR RELIEF

Violation of the Administrative Procedure Act

109.     Plaintiffs incorporate by reference all preceding paragraphs.

110.     Pursuant to the APA, EPA must "within a reasonable time . . . proceed to conclude a matter presented to it."  7 U.S.C. § 555(b).

111.     To date, EPA has failed to issue a final response to Plaintiffs' Petition of October 24, 2012, thereby unreasonably delaying agency action.

112.    This delay and failure to act is particularly unreasonable because the issue of whether to add the oil and gas extraction industry to the list of industries required to report to the TRI has been before EPA for nearly two decades.  Having first considered this issue at least as early as 1996, EPA already has obtained and compiled a considerable amount of the information, analysis, and institutional knowledge needed to respond fully to the Petition.

113.    As recently as 2011, EPA began to reconsider industry sectors it previously deferred in the 1996-97 rulemaking, and Plaintiff Center for Effective Government provided comments squarely raising the need to add the oil and gas extraction industry.

114.    By the time Plaintiffs submitted the Petition in 2012, EPA was not beginning its consideration of the oil and gas extraction industry from scratch.

115.    The longstanding history of EPA's failure to address this regulatory gap renders the present delay even more unreasonable.

116.    Pursuant to the APA, this Court has authority to review and the duty to "compel agency action unlawfully withheld or unreasonably delayed."  7 U.S.C. §§ 702, 706(1).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment as follows:

A.    Declaring that EPA's delay in responding to Plaintiffs' Petition is unreasonable and not in accordance with the APA;

B.    Ordering EPA to issue a final response to the Petition, within a Court-imposed deadline of sixty days;

C.    Retaining jurisdiction of this matter until EPA has fulfilled its legal and Court-ordered obligations;

D.     Awarding Plaintiffs reasonable fees, expenses, and costs, including attorneys' fees associated with this litigation; and

E.     Granting Plaintiffs such further relief as the Court may deem just and proper.

Respectfully submitted this 7th day of January, 2015.

/s/ Adam Kron
ADAM KRON (D.C. Bar No. 992135)
Environmental Integrity Project
1000 Vermont Avenue NW, Suite 1100
Washington, DC 20005
(202) 263-4451
(202) 296-8822 (fax)
akron@environmentalintegrity.org

*Attorney for Plaintiffs*